## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.    BRIAN F. LEONARD, <br> Individually and derivatively on <br> behalf of CHESAPEAKE ENERGY <br> CORPORATION, <br><br>          Plaintiff, <br><br> vs. <br><br> 1.    AUBREY K. McCLENDON, <br> 2.    RICHARD K. DAVIDSON, <br> 3.    KATHLEEN M. EISBRENNER, <br> 4.    V. BURNS HARGIS, <br> 5.    FRANK KEATING, <br> 6.    CHARLES T. MAXWELL, <br> 7.    MERRILL A. MILLER, JR., <br> 8.    DON L. NICKLES, and <br> 9.    LOUIS SIMPSON, <br><br>          Defendants, <br><br>          --and-- <br><br> 10.   CHESAPEAKE ENERGY <br> CORPORATION, an Oklahoma <br> Corporation, <br><br>          Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. CIV-12-479-W |

## SHAREHOLDER DIRECT AND DERIVATIVE COMPLAINT

Brian F. Leonard ("Plaintiff"), through his undersigned attorneys, alleges as follows on information and belief, except as to those matters that are personal to Plaintiff, which are alleged on personal knowledge:

## NATURE OF ACTION

1.     This is a derivative action brought by Plaintiff to address material disclosure violations permitted by the members of the Board of Directors ("the Board" or the "Individual Defendants") of Chesapeake Energy Corporation ("Chesapeake" or "the Company") and to ensure that any damages suffered by Chesapeake by reason of these violations are borne by the Individual Defendants, and not by Chesapeake and its shareholders.

2.     Chesapeake is headquartered in Oklahoma City, Oklahoma and is the second-largest producer of natural gas, a Top 15 producer of oil and natural gas liquids and the most active driller of new wells in the United States.  It is a public company traded on the Nasdaq Stock Market under the ticker symbol "CHK", with nearly 640 million shares outstanding as of December 31, 2011.

3.     Chesapeake was co-founded in 1989 by defendant Aubrey K. McClendon ("McClendon"), who is presently Chief Executive Officer and Chairman of the Board. Indicative of his dominance of the Company and its Board of Directors, McClendon was the highest-paid CEO of all S&P 500 companies in 2008, receiving a compensation package totaling $112 million, which included a $75 million bonus.

4.     While McClendon owns roughly 1.35 million shares of Chesapeake stock (currently worth approximately $24 million), this interest is dwarfed by his personal investments in oil and gas wells being developed by the Company.  Under an agreement unique among public companies in the oil drilling industry known as the Founders Well Participation Program ("FWPP"), McClendon may purchase up to a 2.5% interest in

2

wells being developed by Chesapeake.  Each year, as provided by the FWPP, McClendon must elect to invest in all wells being developed by the Company, or no such wells. Every year since the FWPP was approved by the shareholders in 2005, McClendon has invested in every well.  McClendon has participated aggressively in this program, and amassed interests currently valued at over $300 million.  However, because of the large up front development and operating costs, McClendon's FWPP interests are significantly underwater and have yet to generate any positive cash flow.

5.      Unbeknownst to shareholders, starting in 2009, McClendon leveraged all of his FWPP interests in order to pay up front development costs.  He not only secured loans on all of his ownership interests in the wells, but also sold off revenue "participation rights" in the wells to the financial institutions who held his well interests as collateral.

6.      As a result, by year end 2011, McClendon had amassed personal debt on Chesapeake related wells and parties exceeding $864 million.  The size of the debt and McClendon's leveraging of all his FWPP related interests represented material undisclosed risks to Chesapeake investors.   These undisclosed risks included McClendon's conflicting interests arising from his personal indebtedness (or that of entities controlled by him) to lenders who also had financial dealings with Chesapeake, including the purchase of Chesapeake assets, in transactions overseen by McClendon

7.      McClendon's excessive leverage of his interests in the Company wells and his ability to satisfy those debts was dependent upon the Company's successful performance of the mortgaged wells.   As gas prices tumbled through 2011, those

undisclosed risks exponentially increased as both Chesapeake and McClendon faced significant challenges to pay off debts and finance ongoing operations.

8.      The Company's Proxy Statements, its annual reports on Form 10-K and other SEC filings are required to detail all related party transactions, including all material details related to the FWPP, and all actual and potential conflicts of interest that may arise from McClendon's participation in the FWPP.  The Individual Defendants, as directors and fiduciaries, are required to ensure that all such disclosures are full, accurate and complete, and that nothing is omitted that would make the disclosures misleading.

9.      It wasn't until on April 18, 2012 that these previously undisclosed details were revealed in an exposé by the Reuters news agency and The Wall Street Journal. The revelations showed that McClendon (through companies he controls) had secured up to $1.1 billion in loans to enable him to invest in the FWPP, including as much as $500 million from EIG Global Energy Partners ("EIG"), a private equity firm heavily involved in financial dealings with Chesapeake overseen by McClendon.  Such huge loans raise serious conflicts of interest: they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with EIG on financing or other terms.  Upon revelation of the loans, some analysts opined that EIG's investors have received favorable terms from Chesapeake on recent financing deals.  In addition, loans of such magnitude, which are secured by McClendon's interest in the various wells in which he has interests, may adversely impact Chesapeake and its business should they fall into default.  Finally, the loans call into question whether the FWPP's stated goal of aligning

the financial interests of McClendon with those of the shareholders (as was promised when the FWPP was originally approved in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments.

10.     Reaction to the Defendants' failure to ever disclose and discuss these key matters was highly negative:

(a)     David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business, opined that "[g]iven the size, scope and complicated terms of the loans, their particulars constitute important stockholder information and therefore should be more fully disclosed";

(b)     Joseph Allman, oil and gas industry analyst at JPMorgan in New York, who reviewed the loan agreements, said, "I think the company should disclose this information.  One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing on Chesapeake.  In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO."

11.     In stock trading on April 18, 2012, Chesapeake shares dropped $1.06 or 5.5%, representing a decline of over $500 million in market value.  The Individual Defendants have exposed the Company to class action securities fraud liability as evidenced by a shareholder class action complaint filed on April 26, 2012 alleging violations of section 10(b) of the Exchange Act and Rule 10b-5. [1]

12.     On April 26, 2012, Chesapeake abruptly terminated the FWPP program, while Board members disclaimed any knowledge of the size of McClendon's indebtedness.

13.     By this action Plaintiff seeks: (a) to require the Individual Defendants to disclose all material facts relating to the McClendon loans, and to discuss their actual and

---

[1] *See Weinstein v. McClendon, et al.*, Civ.–12-465 –W (W.D. Okl.), filed April 26, 2012.

potential implications; (b) to establish a method of independent oversight regarding McClendon's borrowing, such that the threats they may represent to the Company can be identified and addressed; (c) to rescind the FWPP as the purpose approved by the shareholders has been frustrated, as McClendon appears to have little or no true personal equity in the wells; and (d) to account to the Company for such damages as it has and will suffer as a result of their violations of law.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) insofar as the claims herein arise under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]. The Court also has jurisdiction under 28 U.S.C. § 1367 as to the state law claims pled herein, insofar as they arise out of the same transactions and occurrences as the federal claims.

15.     Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(a) in that many of the violations alleged herein, including the dissemination of false and misleading proxy statements, occurred in this District.

16.     To the extent that this action is brought derivatively, and is subject to Rule 23 of Federal Rules of Civil Procedure, it is averred that this action is not brought collusively to confer jurisdiction on a court of the United States it otherwise would not have.

## PARTIES

17.   Plaintiff is a shareholder of Chesapeake and has owned shares at all relevant times.

18.   Defendant Aubrey K. McClendon has served as Chairman of the Board and Chief Executive Officer since co-founding the Company in 1989.   He also serves as Officer and Chairman of the Employee Compensation and Benefits Committee.   From 1982 to 1989, Mr. McClendon was an independent producer of oil and natural gas.

19.   Defendant Richard K. Davidson ("Davidson") has been a member of the Board of Directors since March 2006.

20.   Defendant Kathleen M. Eisbrenner ("Eisbrenner") has been a member of the Board of Directors since December 2010.

21.   Defendant V. Burns Hargis ("Hargis") has been a member of the Board of Directors since September 2008.

22.   Defendant Frank Keating ("Keating") has been a member of the Board of Directors since June 2003.

23.   Defendant Charles T. Maxwell ("Maxwell") has been a director of the Company since 2002.

24.   Defendant Merrill A. Miller, Jr. ("Miller") has been a director of the Company since January 2007 and lead independent director since March 2010.

25.   Defendant Don Nickles ("Nickles") has been a member of the Board of Directors since January 2005.

26.     Defendant Louis A. Simpson ("Simpson") has been a director of the Company since June of 2011.

27.     Nominal defendant Chesapeake Energy Corporation is a public company engaged in oil and gas exploration and development.  It is an Oklahoma corporation and maintains its executive offices at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.  On April 29, 2011, it issued a Proxy Statement, and is expected to issue its 2012 Proxy Statement in late April 2012 in anticipation of a June 2012 annual meeting.  No monetary relief is sought from nominal defendant Chesapeake.

## FACTUAL ALLEGATIONS

28.     Chesapeake is the second-largest producer of natural gas, a Top 15 producer of oil and natural gas liquids and the most active driller of new wells in the United States.  It owns interests in approximately 45,700 producing natural gas and oil wells.

29.     Defendant McClendon was a co-founder of Chesapeake in 1989 with co-founder Tom L. Ward who resigned from Chesapeake in February 2006 (the "Founders").

30.     In its early years of operations, the Company routinely sold leasehold interests in drilling prospects it had developed to the Founders and third parties rather than incurring the greater risk of developing the prospects through drilling.  At the time of the Company's initial public offering in February 1993, the Company was retaining significant interests in the Company's prospects during the drilling phase, and the Founders were participating with the Company in its oil and gas wells.  The Founders'

participation program was first formalized and incorporated into the Founders' employment agreements in connection with the IPO in February 1993.   The Board believed the participation program aligned the interests of the Founders with those of the Company because the Founders were investing and sharing the risks and rewards of drilling, on the same basis as the Company.   The directors believed side-by-side participation encouraged the Founders to make decisions that would benefit the Company and its public shareholders.   Participation was considered superior to non-cost bearing management incentives, such as overriding royalties or net profit pools that were frequently awarded by a number of the Company's competitors.

31.   The FWPP was formally approved by Chesapeake shareholders at the Company's annual meeting of shareholders on June 10, 2005.   Such approval was based on representations regarding the purported benefits of the program in aligning McClendon's interests with those of the Company and its shareholders.

32.   For each well in which a Founder participated, the Company or other operator billed the Founder an amount equal to his participation percentage multiplied by the drilling and operating costs incurred in drilling the well, together with leasehold costs in an amount determined by the Company to approximate the Company's average cost in all of the Company's acreage.   Payment was due for such costs promptly upon receipt of an invoice.   The Founder also received a proportionate share of revenue from the well, less certain charges by the Company for marketing the oil and natural gas production. The terms of the Founders' participation were represented to be no better than third party participants' terms in the wells.

33.     The Founders have participated in all wells drilled by the Company to the extent participation was permitted, from its initial public offering in February 1993 through 2005, except during the five quarters from January 1, 1999 to March 31, 2000.

34.     In 2005, the Company formalized this arrangement by proposing shareholder approval of the FWPP.  Under the FWPP, which was duly approved by a shareholder vote and which extends to 2015 for McClendon (co-founder Tom L. Ward left the FWPP in February 2006):

(a)     The Founders are permitted to participate in all of the wells spudded by or on behalf of the Company during each fiscal year;

(b)     A participation election by each of the Founders may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest, after elections by the Founders to participate, would be reduced to below 12.5%;

(c)     The Founders may not participate in (i) any well in which the Company owns an interest and has not elected to participate as a working interest owner with respect to such interest; (ii) any well which constitutes a re-entry of an existing producing well; (iii) any well drilled in a multi-unit secondary or tertiary recovery unit in which the Founders do not already have a working interest by virtue of participation in a well or well(s) that have been combined into the unit: and (iv) any other wells which the Company reasonably determines the Founders should not participate in given the objectives of the Founder Well Participation Program;

(d)     Once a Founder elects to participate, the percentage cannot be adjusted during the fiscal year without the prior written consent of the Compensation Committee; and

(e)     For each well in which a Founder participates, the Company will bill the Founder, on a monthly basis, an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well.  Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. Payment is due for all such costs promptly upon receipt of an invoice.

35.    The Company did not at that time specify how the Founders would pay for their participation investments.  The FWPP promised to align the Founders' financial interests with those of the Company and its shareholders.

36.    McClendon's personal financial issues have, in the past, been of great concern to shareholders, and have had an adverse effect on the stock price.  To increase his holdings in Chesapeake stock, McClendon borrowed money from his brokers, a practice known as buying on margin.  In October 2008, with stock prices imploding, he was forced to sell more than 31 million Chesapeake shares for $569 million to cover margin calls from his brokers.  McClendon issued an apology, but the Company's credibility with many shareholders suffered significantly.  Shareholder lawsuits arising from these events settled with a payment to the Company by McClendon and certain new governance provisions that discouraged speculative stock transactions in Chesapeake stock by Chesapeake executives.

37.    In the wake of the events of 2008, McClendon sought a new (yet undisclosed) method of financing his speculations.  In June 2009, McClendon agreed to borrow up to $225 million from Union Bank, a California lender, pledging his share in wells as collateral.  In December 2010, he borrowed $375 million from TCW Asset Management, a private equity firm located in Los Angeles, California.  And in January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners ("EIG"), a private equity firm formed by former TCW executives.

38.   EIG, which has been involved in financing transactions done by Chesapeake, appears to have connections with McClendon that date back to 2009.  As reported by Reuters on April 18, 2012, the details of the arrangement were detailed in minutes of a February 2011 meeting of the New Mexico Investment Council and EIG's Chief Operating Officer Randall Wade ("Wade").  The article recounts:

> "In fall 2008, Mr. McClendon didn't have liquidity to participate in the (well) program in 2009, at which point EIG entered into discussions with him" and ultimately formed a special purpose vehicle called Larchmont Resources, Wade said.
>
> Through Larchmont, EIG acquired the rights to all of McClendon's well states for 2009 and 2010.  EIG then set up a new special purpose vehicle –Jamestown Resources – to control McClendon's well shares in 2011, with rights to 2012, Wade said.
>
> EIG's investments have been extremely profitable.  "EIG sweeps 100 percent of the cash flow generated by those projects until EIG has gotten all of its money back plus a 13 percent realized return," Wade told New Mexico investors.  EIG also gets a 42 percent cut of McClendon's share of the well profits "in perpetuity," he said.

39.   The Wall Street Journal reported on April 27, 2012, that "in the last six months EIG has participated in groups that have purchased about $2.5 billion in Chesapeake assets." In the same article, the Journal reported that lenders to him or entities controlled by him also received "lucrative work as public offering underwriters or financial advisers to Chesapeake."

40.   Large investment banks and hedge funds such as EIG have been involved in many of Chesapeake's deals and volumetric production payments ("VPP") over the

past few years.  According to an article posted on April 18, 2012 in *Energy Policy Forum*

entitled, "Loans May Not be the Only Worry at Chesapeake".[2]

> Documents filed with the Second Circuit Court of Appeals disclose
> that Chesapeake Energy has structured VPP's in such a way that the
> sale and passing of title of reserve volumes is passed directly to the
> banks.  The recorded conveyances confirm this.  This, of course,
> provides the banks and hedge funds ownership status in the event of a
> Chesapeake bankruptcy.  In short, because the banks own title to the
> covered assets, the reserves are no longer a part of the debtors estate
> in bankruptcy and therefore legal entanglement is avoided in paying
> creditors' claims.  ***The banks and hedge funds now carry these assets
> on their balance sheets and Chesapeake has removed them from
> their balance sheet.*** (emphasis added)
>
> It is reasonable to assume that Chesapeake has structured most if not
> all these VPP's in a similar fashion.  Therefore foreign entities, such
> as the China Investment Corp. could also enjoy the same benefits….
>
> And yes, there is more.  ***The court documents claim that Chesapeake
> has been overproducing wells in order to meet production targets of
> these banks….*** (emphasis added)

41.    On April 18, 2012, Chesapeake responded to the Reuters breaking news

concerning the $1.1 billion in loans to McClendon to enable him to invest in the FWPP.

The Board downplayed the significance of McClendon's borrowing and assured the

public in a press release captioned "Chesapeake Energy Corporation General Counsel

Henry J. Hood Issues Statement"  that:

> "The Board of Directors is fully aware of the existence of Mr.
> McClendon's financing transactions and the fact that these occur is
> disclosed in the proxy. Additionally, the total amount of his cost
> obligations and revenue attributable to the FWPP for each year are
> detailed in the proxy. The FWPP fully aligns the interests of Mr.
> McClendon with the company and the Board of Directors supports
> this program as does the majority of its shareholders."

---

[2] Available at: http://energypolicyforum.com/?p=345

42.    On April 20, 2012, Chesapeake filed its preliminary proxy statement with the SEC, disclosing for the first time greater details, but not all, regarding McClendon's excessive leveraging and potential conflicts:

> From time to time, Mr. McClendon has sold FWPP interests separately and concurrent with sales by the Company of its interests in the same properties.  In any concurrent sales the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests. *[During 2011, Mr. McClendon advised that he realized $  million from such sales, net of his $  million share of deal costs.  According to Mr. McClendon, his net investment in these properties was $  , including lease costs and well costs paid to the Company, less revenues paid by the Company.]*   Additionally, over the life of the FWPP, Mr. McClendon has typically mortgaged his interests acquired under the FWPP with one or more lenders, some of which also have lending, investment or advisory relationships with the Company.   Mr. McClendon's mortgages with these lenders secure loans used in whole or in part to fund Mr. McClendon's well costs.  *The Company does not extend loans to Mr. McClendon for participation in the FWPP or any other purposes.  The Company does not review or approve financing of Mr. McClendon's personal assets, including his FWPP interests.*  In addition, the Company has no obligation to repay any loans Mr. McClendon may obtain nor are any of the Company's interests in any assets exposed to such loans or the mortgages securing them. (blanks in original, emphasis added).

43.    On April 26, 2012 the Board of Directors announced that it did not intend to extend the Company's FWPP with McClendon, beyond its present 10-year term ending December 31, 2015.   Additionally, the Board of Directors announced that McClendon will separately disclose supplemental information regarding the interests he has acquired through the Company's FWPP as of December 31, 2011.

44.    In complete contradiction to the Boards reassuring statements on April 18, 2012 that they "were fully aware of the existence of Mr. McClendon's financing

transactions," the Board of Directors wished to clarify a statement previously appearing in its April 18, 2012 press release captioned "Chesapeake Energy Corporation General Counsel Henry J. Hood Issues Statement."  The April 26, 2012 press release entitled "Chesapeake Energy Corporation's Board and CEO Aubrey K. McClendon Agree to Negotiate Early Termination of Founder Well Participation Program", stated that (emphasis added):

> The statement that "the Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions" was intended to convey the fact that the Board of Directors is ***generally aware*** that Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions. ***The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.***

45.     The change in Chesapeake's public statements from the board having been "fully aware of the existence of Mr. McClendon's financing transactions" to the board having been "generally aware" of such transactions elicited the following comments, as reported by The Wall Street Journal in its April 27th article:

(a)     Professor Lucian Bebchuk, Harvard Law School: The board is "seeking to distance itself from the sweeping endorsement suggested by the general counsel's earlier statement" and noting that the board now seems to understand "the necessity of a more careful and detailed review of the transactions than has been undertaken in the past."

(b)     Professor Henry Hu, University of Texas Law School: Noting the board's duty to learn about the particulars of related party transactions such as those in which McClendon engaged because they raise potential conflicts of interest, he added, "The board's statement raises questions about whether it was as careful as it should have been."

(c)     Ben Heineman, former General Electric general counsel who teaches corporate governance at Harvard, said the board, in effect, is saying it would "rather just look ill-informed and negligent than complicit in McClendon's deals."

46.     It is no surprise that shareholders reacted with alarm when these tangled transactions were originally revealed on April 18, 2012 and to subsequent Board statements wavering on the exact amount of oversight concerning McClendon's FWPP financial dealings.  Such huge loans raise serious conflicts of interest: they can easily cloud the CEO's judgment on key issues ranging from how quickly Chesapeake should generate cash flow, to how it operates wells, to how aggressively it can bargain with EIG on financing terms.  Indeed, upon revelation of the loans, some analysts opined that EIG's investors have received favorable terms from Chesapeake on recent financing deals.  In addition, the above loans of such magnitude, which are secured by McClendon's interest in the various wells in which he has interests, may adversely impact Chesapeake and its business should they fall into default.  Finally, they call into question whether the FWPP's stated goal of aligning the financial interests of McClendon with those of the shareholders (as was promised when the FWPP was approved in 2005) has been frustrated, due to the appearance that McClendon has taken no true risk in his investments that align with shareholders.

47.     In its April 27th article, The Wall Street Journal reported that Standard & Poor's lowered Chesapeake's ratings to two notches below investment-grade because of concerns about Chesapeake's corporate governance and McClendon's activities,

demonstrating an adverse financial impact attributable to the Chesapeake's and McClendon's undisclosed conduct.

## **DEMAND IS FUTILE**

48.     Counts II and III of this Complaint are brought derivatively, for the benefit of the Company.  Demand upon the Board of Directors as to these Counts is and would be futile for the reasons that follow.

49.     As to Count II, the Directors knew of or, in the exercise of diligence, would have known of the actual and potential conflicts of interest and the material facts concerning the McClendon loans detailed herein, and failed to disclose them.  Given the strict liability or negligence standard applicable to liability under this Count, the Board of Directors stands a substantial likelihood of being held liable, and thus cannot independently evaluate a demand.

50.     The comments of noted experts on the board's performance demonstrate the complete inability of the board to judge its own conduct in failing to police transactions that have now inured to the substantial financial detriment of Chesapeake, including not only substantial litigation exposure and expense, but also increased borrowing costs as a result of the S&P downgrade directly attributable to this undisclosed conduct.

51.     In addition, the omission of material information regarding related party transactions cannot be a reasonable exercise of business judgment, rendering such acts incapable of director ratification and rendering demand upon directors who have acted in this manner excused as futile.

52.     Finally, the directors have pre-judged this matter.  Upon revelation of the adverse facts on April 18, 2012, the Individual Defendants authorized or acquiesced in Chesapeake's General Counsel asserting that no disclosures were or will be necessary, citing as authority a Delaware decision, *Beam v. Stewart*, a completely inapplicable precedent that had to do with a Board's lack of an obligation  to monitor defendant Stewart's unlawful "tippee" trading in another company's stock, and which had nothing whatsoever to do with the defendant's conflict of interest or related party transactions. Having made up their minds, the Individual Defendants cannot impartially consider a demand.

## CLAIMS FOR RELIEF

## COUNT I

## Direct Claim for a Declaratory Judgment Under the Federal Proxy Laws

53.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.  This Count is brought directly, and not derivatively, against the Individual Defendants.

54.     Under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated hereunder, the Individual Defendants had an obligation to ensure that any proxy statement issued by the Company contained information that is full, fair, accurate and not deficient in a way so as to make the information therein misleading.

55.     The Company's April 29, 2011 Proxy Statement discussed the FWPP and McClendon's investment without also addressing the various attendant material facts

concerning the loans and the conflicts of interest they entailed. This failure rendered that Proxy Statement to contain materially deficient, false and misleading information.

56.     By reason of the foregoing, Plaintiff is entitled to a judgment that the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated, and awarded all declaratory, injunctive and monetary relief necessary to address and remedy this violation.

## COUNT II

### Derivative Claim for Violations of Federal Proxy Laws

57.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.  This Count is brought derivatively against the Individual Defendants for the benefit and protection of Chesapeake.  This claim is brought in the alternative to Count I under Rule 8(d)(2) of the Federal Rules of Civil Procedure.

58.     Under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated hereunder, the Individual Defendants had an obligation to ensure that any proxy statement issued by the Company contains information that is full, fair, accurate and not deficient in a way so as to make the information therein misleading.

59.     The Company's April 29, 2011 Proxy Statement discussed the FWPP and McClendon's investment without also addressing the various attendant material facts concerning the loans and the conflicts of interest they entailed.  This failure rendered that Proxy Statement materially deficient, false and misleading.

60.     By reason of the foregoing, Plaintiff is entitled to a judgment that the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated, and awarded derivatively for the benefit of the Company all declaratory, injunctive and monetary relief necessary to address and remedy this violation.

## COUNT III

### For Breach of Fiduciary Duty

61.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

62.     The individual Defendants owe Chesapeake the highest duty of due care, loyalty, and candor.

63.     The foregoing duties required the Individual Defendants to ensure that Chesapeake released, disclosed, and discussed all material information necessary to protect the Company, and to fulfill its disclosure obligations.  Defendants have failed to act in good faith to fulfill their duties, and consciously disregarded their duties.

64.     To the extent Chesapeake has or will be injured by these acts and failures to act, the defendants must account to the Company for these failures, and breaches of fiduciary duty.

65.     Additionally, so as to avoid further harm to Chesapeake, defendants must be ordered to: (a) disclose all material facts related to the McClendon loans, and to discuss their actual and potential implications; (b) establish a method of independent oversight regarding McClendon's borrowings, such that the threats they may represent to the Company can be identified and addressed; (c) rescind the FWPP as the purpose

approved by the shareholders has been frustrated, as McClendon appears to have little or no true personal equity in the wells; and (d) account to the Company for such damages as it has and will suffer as a result of their violations of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      As to Counts I and II, declaring that Defendants have violated the federal proxy laws, and ordering all appropriate declaratory, injunctive and monetary relief flowing from these violations;

B.      As to Count III, declaring that Defendants have breached their fiduciary duties, ordering them to account to Chesapeake for the damages it has accordingly suffered, and ordering them to affirmatively take the actions requested to remedy their breaches;

C.      As to all Counts, an award of reasonable attorneys' and experts' fees and expenses; and

D.      Such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

Date:  April 30, 2012

*s/ Kenyatta R. Bethea*
Kenyatta R. Bethea OBA #18650
**HOLLOWAY BETHEA &**
**OSENBAUGH PLLC**
3035 N.W. 63rd Suite 102N
Oklahoma City, OK 73116
Telephone: (405) 694-4469
Facsimile: (405) 810-4080
kbethea@hbolaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
Vernon J. Vander Weide
Nathan D. Prosser
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone:   612-339-6900
Facsimile: 612-339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com
ndprosser@locklaw.com

AND

**LEONARD, O'BRIEN, SPENCER,**
**GALE & SAYRE, LTD.**
Edward W. Gale
Thomas C. Atmore
100 South 5th Street, Suite 2500
Minneapolis, MN 55402
Telephone: 612-332-1030
Facsimile: 612-332-2740
egale@losgs.com
tatmore@losgs.com

**ATTORNEYS FOR PLAINTIFF**

## <u>VERIFICATION</u>

I, Gregg M. Fishbein, under penalty of perjury under the laws of the United States, aver that I am counsel to plaintiff Brian F. Leonard.  I verify that I have reviewed the foregoing Shareholder's Direct and Derivative Complaint and that the allegations are true and correct to the best of my information, knowledge and belief.  I am making this verification because the Plaintiff is not located in this judicial district.


*s/ Gregg M. Fishbein*_____
Gregg M. Fishbein